# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| AMERICAN HEALTHCARE ADMINISTRATIVE SERVICES, INC., AHAS HOLDINGS, INC., CHRISTINE SCHAFFER, CHRISTINE SCHAFFER REVOCABLE LIVING TRUST, GROVER LEE, GROVER LEE REVOCABLE LIVING TRUST, CHARLES E. LEE, CHARLES E. LEE LIVING TRUST, JACQUELINE C. LEE, JACQUELINE C. LEE LIVING TRUST, CHARLES E. LEE 2012 TRUST NO. 1, CHARLES E. LEE 2012 TRUST NO. 2, JACQUELINE LEE 2012 TRUST NO. 1, and JACQUELINE LEE 2012 TRUST NO. 2, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs/Counterclaim-Defendants, | ) ) | |
| v. | ) ) | C.A. No. 2019-0793-JTL |
| LANCE AIZEN, | ) ) ) | |
| Defendant/Counterclaim-Plaintiff. | ) | |

## OPINION

Date Submitted: September 16, 2022
Date Decided: November 18, 2022

Thomas W. Briggs, Jr., Sabrina M. Hendershot, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Christopher R. Rodriguez, Andrew D. Bluth, SINGLETON SCHREIBER, LLP, Sacramento, California; *Attorneys for Plaintiffs/Counterclaim-Defendants*.

Paul D. Brown, Joseph B. Cicero, Gregory E. Stuhlman, Aidan T. Hamilton, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; *Attorneys for Defendant/Counterclaim-Plaintiff*.

**LASTER, V.C.**

A corporation sold assets to a buyer. The buyer placed a portion of the consideration in escrow to fund any purchase price adjustment and to secure indemnification obligations. The asset purchase agreement appointed the corporation's former CEO as the sellers' representative for purposes of making decisions about the escrowed funds.

The period for holding the escrowed funds has expired, and no claims against the escrowed funds remain outstanding. The buyer agrees it has no claim to the funds. The sellers' stockholders, other than the former CEO, want the funds released from escrow and paid over to the corporation. They filed this action against the former CEO and asserted a series of claims, all of which are designed to compel the release of the escrowed funds.

The former CEO answered, raised affirmative defenses, and filed counterclaims, all of which are designed to obtain a determination that he has authority to keep the funds in escrow. The former CEO is embroiled in litigation with the selling corporation over his termination, and he believes that if the escrowed funds are released to the corporation, then the corporation will distribute them to its stockholders and render itself judgment-proof. The former CEO wants to keep the funds in escrow so that they can serve as a source of recovery if he prevails in his litigation. He contends that he has discretion as the sellers' representative to decline to release the funds from escrow. He argues in the alternative that the court should order the funds to remain in escrow as a matter of equity.

This decision grants the selling stockholders' motion for partial judgment on the pleadings. There is no contractual basis for maintaining the funds in escrow. All of the conditions for releasing the escrowed funds have been satisfied. The former CEO has discretionary authority over the release of the escrowed funds, but he must exercise that

authority consistent with the implied covenant of good faith and fair dealing, which means consistent with the purpose of the contract and the range of possibilities that the parties would have agreed upon if they had anticipated the issue and bargained over it when negotiating their agreement. Keeping the funds in escrow to serve as a source of recovery for a personal dispute is not a purpose that the parties would have agreed upon if they had anticipated the issue and addressed it during the original bargaining phase.

To the extent the former CEO seeks a remedy that would prevent the selling company from distributing the funds to its stockholders, he should seek that remedy from the court presiding over his lawsuit against the selling company. To ensure that the former CEO has the opportunity to seek that relief, and to avoid burdening a sister court with an emergency application, the order implementing this ruling will provide for the release of funds from escrow on a date not earlier than sixty days after the judgment in this case becomes final.

## I. FACTUAL BACKGROUND

The facts are drawn from the operative pleadings and the documents they incorporate by reference. When evaluating a motion for judgment on the pleadings, the facts must be viewed in the light most favorable to the non-movant. In this case, that means the facts are viewed in the light most favorable to the former CEO.

### A. The Company And Its Affiliates Before The Asset Sale

American Healthcare Administrative Services, Inc. (the "Company") is a California corporation with its principal place of business in Rocklin, California. Grover Lee and Christine Schaffer founded the Company in 1986 to provide pharmacy benefits services to

3

self-insured employers, health plans, hospitals, school districts, labor unions, and health and welfare funds. Dkt. 50 ¶ 18. Today, the Company is a wholly owned subsidiary of AHAS Holdings, Inc. ("Parent"). Surprisingly, the parties dispute whether Parent is an entity that exists under Delaware law or California law. The dispute is immaterial to the contractual issues addressed by this decision, but given the procedural posture, the court assumes that Parent is a California entity. Lee and Schaffer comprised the original members of the board of directors of the Company (the "Company Board") and the original members of the board of directors of Parent (the "Parent Board").

**B.      Lee Aizen Joins The Company.**

In 2010, the Company hired Lee Aizen as Vice President of Sales. Dkt. 58 at 8. Aizen asserts that he "added professionalism and non-family oversight" to an operation that was "losing money consistently" due to "mismanagement" and "personal expenses of the Lee family." *See* Dkt. 58 at 8. This assertion does not matter to the outcome of the case, but given the procedural standard, I assume it to be true.

In 2012, Aizen became President of the Company. He later took on the title of CEO. Dkt. 58 at 8.

Aizen subsequently entered into an employment agreement dated November 21, 2014 (the "Employment Agreement"). *See* Dkt. 58 at 11. Surprisingly, it is not clear what entity served as the counterparty. The parties have not provided the court with a copy of the Employment Agreement, and two other documents point in different directions, with one document implying that the Company is the counterparty and the other implying that Parent is the counterparty. *Compare* Compl. Ex. D (Company) *with* Dkt. 53 Ex. A (Parent).

4

Aizen contends that his Employment Agreement was with the Company. That is the version of the facts most favorable to his position, so I assume it to be true.

Under the terms of the Employment Agreement, Aizen received base compensation of $550,000, up from his pre-agreement compensation of $354,750. He also received an option to purchase 1,000 shares of Company stock. Aizen borrowed $2.4 million from Parent to pay for the shares, documented by a promissory note. *See* Dkt. 53 ¶ 22; *id.* Ex. A at 1–2. The Employment Agreement provided that if the Company ever terminated Aizen's employment as a result of a "Change of Control Transaction," then the Company would (i) forgive any amounts payable under the promissory note and (ii) make additional payments to Aizen. Dkt. 58 at 10, 12, 15; *accord* Dkt. 56 at 6. Aizen also joined the Company Board and the Parent Board. *Cf.* Dkt. 50 ¶ 40; Dkt. 53 at 19.

In March 2017, the Parent Board approved an addendum to the Employment Agreement (the "Addendum"). The Addendum extended the term of Aizen's employment through December 31, 2020 and increased his base salary to $750,000. Dkt. 53 Resp. No. 24.

## C.     The Asset Purchase Agreement And The Termination Agreement

Soon after the execution of the Addendum, Maxor Acquisition, Inc. (the "Buyer") expressed interest in acquiring two of the Company's lines of business. *See* Dkt. 50 Ex. B at A-1. The parties disagree about whether the two segments made up a majority of the Company's business. That fact does not have any bearing on the outcome of the case, but Aizen denies that they did, so given the procedural standard, I accept his assertion.

5

On August 10, 2017, the Company reorganized its corporate structure in anticipation of selling the two lines of business. As part of the reorganization, Aizen exchanged his shares in the Company for shares in Parent. After the reorganization, Aizen, Lee, Schaffer, and their affiliates owned all of the stock in Parent.[1] Aizen owned ten percent of Parent's equity, and Lee, Schaffer, and their affiliates owned the remaining ninety percent. *See* Dkt. 53 ¶ 37; *accord* Dkt. 54 Resp. No. 37.

On June 26, 2018, the Parent Board passed a resolution approving and authorizing the Company to proceed with the asset sale, which it defined as the "Transaction." *See* Dkt. 53 Ex. A. The agreement governing the Transaction is an asset purchase agreement dated June 27, 2018. Dkt. 50 Ex. B (the "APA" or "Purchase Agreement"). The parties to the Purchase Agreement were the Buyer and a group defined as the "Seller Parties," which consisted of the Company, Parent, and all of the Parent's stockholders (including Aizen). *See* APA at 1. Aizen also became a party to the Purchase Agreement, but only in his capacity as the "Sellers' Representative." *See id.* In that capacity, Aizen acted as the agent of the Seller Parties for purposes of taking various actions under the Purchase Agreement. The use of a sellers' representative is a common feature in transaction agreements, particularly where there are many selling stockholders, and it avoids the need to have

---

[1] The following entities are affiliates of Lee or Schaffer and own stock in Parent: the Christine Schaffer Revocable Living Trust, the Grover Lee Revocable Living Trust, the Charles E. Lee Living 2012 Trust No. 1, the Charles H. Lee 2012 Trust No. 2, the Charles E. Lee Living Trust, the Jacqueline C. Lee 2012 Trust No. 1, the Jacqueline C. Lee 2012 Trust No. 2, and the Jacqueline C. Lee Living Trust. *See* Dkt. 58 at 6–7.

multiple parties sign off on the acts necessary to complete a deal. 1 ABA Mergers & Acqs. Comm., *Model Stock Purchase Agreement with Commentary* § 12.5 at 358 (2d ed. 2010) (explaining that appointment of sellers' representative is for buyer's convenience, particularly when buyer "would prefer to deal with one person"; stating that sellers "will want to assure that Sellers' Representative acts only within prescribed bounds.").

The Parent Board also approved an agreement terminating Aizen's Employment Agreement (the "Termination Agreement"). The resolution recited that "in connection with the Transaction, the Aizen Employment Agreement shall be terminated . . . pursuant to the [the Termination Agreement]." Dkt. 53 Ex. A § II. Under the Termination Agreement, Aizen became entitled to receive a range of benefits if the Transaction closed successfully, including (i) a transaction bonus, (ii) complete forgiveness of Parent's loan to Aizen, (iii) a tax gross-up payment for the loan forgiveness, and (iv) a mutual release between Aizen and Parent for all actions that occurred before closing. *Id.*

The Termination Agreement contemplated a handsome payout for Aizen. He stood to receive a $9 million "Change of Control Bonus" plus additional consideration of $11.8 million to be paid monthly in $500,000 increments. *See* Dkt. 50 Ex. D §§ 1–4. Aizen also became entitled to a six-month consulting engagement with the Buyer. *See* APA at 1 (Background Statement); *see also id.* § 7.1(r).

### D.     The Transaction Closes.

The Transaction closed on September 17, 2018. The Buyer paid $55 million in exchange for "all of the Seller's right, title, and interest as of the Closing in all properties,

7

assets, rights and interests of any kind, whether tangible or intangible, real or personal" that related to the two lines of business that the Company sold. *See* APA § 2.1(a).

At closing, the Buyer placed $5.5 million of the purchase price in escrow to secure the Company's contingent financial obligations under the Purchase Agreement (the "Original Escrow Amount"). *See id.* § 2.5(a)(i). Of this amount, $5 million secured the Company's contingent obligation to make indemnification payments. The Purchase Agreement referred to this portion of the Original Escrow Amount as the "Indemnity Escrow Amount." *See id.* The remaining $500,0000 secured the Company's contingent obligation to make a purchase price adjustment. The Purchase Agreement referred to this portion of the Original Escrow Amount as the "Adjustment Escrow Amount." *See id.*

The parties agreed that the funds would be held in an escrow account governed by the terms of an escrow agreement. *See* APA Ex. A (the "Escrow Agreement" or "EA"). The Escrow Agreement recited that the escrowed funds were "intended to provide assurance to Buyer in respect of certain obligations of the Seller Parties set forth in the Purchase Agreement." EA at 1 (Recitals). The Escrow Agreement also stated that the escrowed funds could be used only for their designated purpose, *i.e.*, to satisfy an indemnification claim or purchase adjustment. *Id.* § 6(e) ("No Escrow Funds held in one Escrow Account shall be used for the purposes of the other Escrow Account or for any other purposes other than as set forth in this Agreement.").

At closing, the Company paid Aizen the $9 million bonus that he was due under the Termination Agreement. *See* Dkt. 58 at 9.

8

**E.    Litigation Ensues.**

After the Transaction closed, the relationship between Grover, Schaffer, and Aizen soured. On October 16, 2018, Aizen resigned from the Company Board and the Parent Board. *See* Dkt. 50 ¶ 40; *accord* Dkt. 53 Resp. No. 40. On October 23, he filed suit against the plaintiffs in the United States District Court for the District of New Jersey. *See Aizen v. Am. Healthcare Admin. Servs., Inc.*, No. 3:18-CV-15195-BRM-DEA (D.N.J. Oct. 23, 2018) (the "New Jersey Action"). Aizen claimed that the defendants had failed to pay him amounts to which he was entitled under the Termination Agreement.

On November 6, 2018, the Company terminated Aizen. On November 19, the Company and Parent filed a complaint against Aizen in the Superior Court of California. *See Am. Healthcare Admin. Servs., Inc. v. Aizen*, No. S-CV-0042143 (Cal. Sup. Ct. Nov. 19, 2018) (the "California Action"). The complaint asserted claims for breach of fiduciary duty, fraudulent nondisclosure, intentional misrepresentation, conversion, declaratory relief, and breach of the covenant of good faith and fair dealing. As relief, the Company asked for a declaration that the Termination Agreement was "void and unenforceable" and an injunction compelling Aizen to return all consideration he received under that agreement. Dkt. 50 ¶ 46. Aizen did not respond, and the Company obtained a default judgment against him that included damages of $9.5 million (the "California Default Judgment").

By letter dated February 13, 2019, the Company informed the Buyer of Aizen's termination. Notwithstanding the California Default Judgment, Aizen's counsel sent a letter to the Buyer that same day disputing the validity of the termination. Dkt. 50 Ex. E.

9

at 1. Aizen's counsel also instructed the Buyer to transfer the escrowed funds to an escrow account under Aizen's control, reasoning as follows:

> Maxor should be aware that Mr. Aizen has specifically alleged in his pending lawsuit that, *inter alia*, Ms. Schaffer and other AHAS Defendants fraudulently induced Mr. Aizen to effectuate the asset purchase transaction with the specific intent of later denying him his contractually-obligated [sic] payments under that transaction, and that the AHAS Defendants will fraudulently dissipate and convert any further payments made by Maxor . . . . Therefore, in order to prevent any such fraudulent dissipation and converstion [sic], as previously requested by Mr. Aizen as the designated Seller's [sic] Representative, Mr. Aizen again requests that all remaining payments due to American Healthcare and/or [the Parent] under the APA, *including the funds currently held in escrow under the APA,* be wired to an escrow account created by Mr. Aizen. Mr. Aizen will hold all such funds in escrow pending resolutions of his ongoing disputes with the AHAS Defendants.

*Id.* at 3 (emphasis added). Aizen thus took the position that he was a creditor of the Company, that there was a risk that the Company would distribute the escrowed funds to its stockholders as a fraudulent conveyance, and that he was entitled to control the funds pending resolution of his claims.

On September 26, 2019, the federal court dismissed the New Jersey Action for lack of jurisdiction. *See Aizen v. Am. Healthcare Admin. Servs., Inc.*, 2019 WL 4686811, at *1 (D.N.J. Sept. 26, 2019). It appeared that all of the outstanding litigation over Aizen's termination had been resolved.

On October 2, 2019, the plaintiffs to this action filed their original complaint. Based on the California Default Judgment, they sought to revoke Aizen's authority to act as the Sellers' Representative. *See* Dkt. 1. They also sought expedited relief on the theory that Aizen had attempted and would continue to attempt to transfer the escrowed funds to his control.

10

Shortly after the court granted expedition, Aizen moved to vacate the California Default Judgment. On November 13, 2019, the parties agreed to stay the proceedings in this action pending resolution of that motion. *See* Dkt. 37.

In addition to staying this action, the parties agreed to replace the Buyer-controlled escrow account with a replacement account jointly established by Delaware counsel (the "Delaware Escrow Account"). *Id.* ¶ 2. Their stipulation provided that any funds in the Delaware Escrow Account only would be released to the Company based on an order from this court or joint instructions from Delaware counsel. *Id.* The parties expressly preserved their positions regarding the underlying dispute. *Id.* ¶ 5 ("By entering into the Stay, neither Plaintiffs nor Defendant waive any, and expressly preserve all rights, claims and defenses.").

The court entered the parties' stipulation as an order. *See* Dkt. 38 (the "Stay and Escrow Order"). In accordance with the Stay and Escrow Order, the parties entered into a new escrow agreement with Wilmington Trust, N.A. as escrow agent. Dkt. 50 Ex. F.

## F.     Aizen Refuses To Release Funds From Escrow.

On January, 31 2020, the California court granted Aizen's motion to vacate the California Default Judgment. The parties spent the next twelve months negotiating with the Buyer over a post-closing price adjustment and claims for indemnification. *See* Dkt. 58 at 14. On December 17, the parties and the Buyer reached agreement on a payment from the original escrow account to the Buyer. With that issue resolved, the Buyer released $5,200,643.26 (the "Remaining Escrow Amount") to the Delaware Escrow Account. The

11

Buyer makes no claim to the Remaining Escrow Amount. The only dispute is between Aizen and the plaintiffs.

By letter dated December 23, 2020, the plaintiffs' Delaware counsel asked Aizen's Delaware counsel to release the Remaining Escrow Amount. *See* Dkt. 50 Ex. G. By letter dated January 25, 2021, Aizen's Delaware counsel declined, taking the position that the Remaining Escrow Amount should remain in escrow until the final disposition of the California Action. Aizen's counsel reasoned as follows:

> Based on the record as it exists today, no further release is appropriate at this time. Indeed, the entire point of the Stipulation and Order and the new joint Delaware Escrow was to allow those funds to be protected in the hands of a neutral party while the parties [sic] claims moved forward, which is occurring in California at this time. Thus, [the Company's] request is premature and unjustified. The Delaware Action should remain stayed and the funds in the joint Delaware Escrow until the California action has been fully adjudicated. . . . As you may know, the parties to the California action have made significant claims against each other and these funds should be available to satisfy any successful claims asserted in California. . . . The request to distribute the funds—given the pending allegations in the California action—raises serious issues about the lawfulness and motives of the request.

Dkt. 50 Ex. H at 2.

Elaborating, Aizen's Delaware counsel asserted that preserving Aizen's access to the Remaining Escrow Amount was necessary to protect Aizen's ability to recover in the California Action. Counsel asserted that "[the Company] has little to no ongoing business yet continues to dissipate assets, including through excessive and unjustified salaries, which constitute breaches of fiduciary duties by Grover Lee and Christine Schaffer." *Id.* at 2–3. Aizen's counsel refused to release the Remaining Escrow Amount absent "sufficient evidence about [the Company's] financial condition and performance to ensure any release

12

will not be in furtherance of the foregoing wrongful acts, and to ensure that [the Company] is not already technically insolvent in view of its liquidated obligations." *Id.* at 3 (citing the Delaware Uniform Fraudulent Transfer Act, 6 *Del. C.* § 1301 *et seq.*).

## G.     This Dispute

With the California Default Judgment vacated, this court lifted the stay. *See* Dkt. 48. The plaintiffs filed an amended complaint in which they alleged that Aizen had improperly refused to release the Remaining Escrow Amount to the Company. *See* Dkt. 50. Aizen filed an answer, raised affirmative defenses, and asserted counterclaims for breach of contract. *See* Dkt. 53.

The plaintiffs then moved for partial judgment on the pleadings. *See* Dkt. 56. They seek declarations that (i) the Company is entitled to the release of the Remaining Escrow Amount, (ii) Aizen has no authority to retain the Remaining Escrow Amount, and (iii) Aizen cannot preserve the Remaining Escrow Amount in escrow as a form of pre-judgment attachment. The plaintiffs seek a decree of specific performance compelling Aizen to issue joint instruction to the escrow agent to release the Remaining Escrow Amount to the Company. *Id.* at 4.

## II.     LEGAL ANALYSIS

The plaintiffs have moved for partial judgment on the pleadings under Rule 12(c). "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Ct. Ch. R. 12(c). "A motion for judgment on the pleadings may be granted only when no material issue of fact exists and the movant is

13

entitled to judgment as a matter of law." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

This case primarily presents issues of contract interpretation. "[J]udgment on the pleadings . . . is a proper framework for enforcing unambiguous contracts because there is no need to resolve material disputes of fact." *NBC Universal v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005). "The proper interpretation of language in a contract, while analytically a question of fact, is treated as a question of law both in the trial court and on appeal." *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991) (citation omitted).

"When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions." *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

"Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning." *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012). The "contract's construction should be that which would be understood by an objective, reasonable third party." *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal citation omitted). "Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it." *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is

14

the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

"In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "[T]he meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

"Contract language is not ambiguous merely because the parties dispute what it means. To be ambiguous, a disputed contract term must be fairly or reasonably susceptible to more than one meaning." *Alta Berkeley*, 41 A.3d at 385 (footnote omitted). If the language of an agreement is ambiguous, then the court "may consider extrinsic evidence to resolve the ambiguity." *Salamone*, 106 A.3d at 374. Permissible sources of extrinsic evidence may include "overt statements and acts of the parties, the business context, prior dealings between the parties, and business custom and usage in the industry." *Id.* (cleaned up). A court may consider "evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). "When the terms of an agreement are ambiguous, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement." *Sun-Times Media Grp. v. Black*, 954

15

A.2d 380, 398 (Del. Ch. 2008) (cleaned up). "[T]he private, subjective feelings of the negotiators are irrelevant and unhelpful to the Court's consideration of a contract's meaning, because the meaning of a properly formed contract must be shared or common." *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 835 (Del. Ch. 2007) (footnote omitted).

## A.  The Company's Rights To The Remaining Escrow Amount

The plaintiffs seek a declaratory judgment that the Company is entitled to the immediate release of the Remaining Escrow Amount under the terms of the Purchase Agreement. This decision grants that aspect of the plaintiffs' motion.

### 1.  The Plain Language Of The Escrow Release Provisions

The analysis turns on the plain language of the provisions in the Purchase Agreement that govern the release of the Original Escrow Amount. Recall that the Original Escrow Amount has two components. The smaller component of $500,000 is the Adjustment Escrow Amount. The larger component of $5 million is the Indemnity Escrow Amount. Section 2.7(b) of the Purchase Agreement governs the release of the Adjustment Escrow Amount. Section 6.4 of the Purchase Agreement governs the release of the Indemnity Escrow Amount. This decision refers to them together as the "Escrow Release Provisions."

The plain language of Section 2.7(b) governs the release of any amounts that might have been attributable to the Adjustment Escrow Amount. The relevant language states:

> Sellers' Representative and the Buyer shall send joint written instruction to the Escrow Agent to disburse to the Buyer a portion of the Adjustment Escrow Amount equal to the payment (if any) owed to the Buyer under this

16

Section 2.7(b) [which governs any post-closing adjustment to the transaction consideration] and the remaining Adjustment Escrow Amount (if any) to the Seller, to the account designated on the Closing Statement.

APA § 2.7(b). The plain language of this section contemplates that after any post-closing pricing adjustment has been determined, the Sellers' Representative and the Buyer will send joint written instructions to release any remaining amount to the Company.

When the parties reached agreement with the Buyer on the Remaining Escrow Amount, they necessarily reached agreement on "the payment (if any) owed to the Buyer" under the section of the Purchase Agreement governing the post-closing adjustment. Once that happened, Aizen was obligated in his capacity as Sellers' Representative to join with the Buyer in sending "joint written instructions to the Escrow Adjustment to disburse . . . the remaining Adjustment Escrow Amount (if any) to the Seller."

The plain language of Section 6.4 calls for the release of any amounts that might have been attributable to the Indemnity Escrow Amount. The relevant language states:

> Pursuant to the terms of the Escrow Agreement, on the date which is 15 months after the Closing Date (the "Escrow Release Date"), the Buyer and the Sellers' Representative shall send joint written instruction to the Escrow Agent to release the remaining Indemnity Escrow Amount (and all interest accrued thereon) to Seller as directed by the Buyer and the Sellers' Representative to the Escrow Agent; provided that, any amount of the Indemnity Escrow Amount subject to the Reserve (as defined in the Escrow Agreement) shall only be released in accordance with the Escrow Agreement.

*Id.* § 6.4.

The language of Section 6.4 contemplates that the Company will receive the Indemnity Escrow Amount when three requirements are met. Each has been satisfied:

- The Transaction closed on September 17, 2018.

17

- More than fifteen months have passed since the closing date.

- As a result of the agreement over the Remaining Escrow Amount, there is no dispute about the amount of any "Reserve" that might be required.

As soon as these requirements were met, Aizen became obligated in his capacity as Sellers' Representative to join with the Buyer in sending "joint written instructions to the Escrow Agent to release the remaining Indemnity Escrow Amount (and all interest accrued thereon) to Seller."

Putting the Escrow Release Provisions together results in Aizen having a contractual obligation as Sellers' Representative to issue the instructions necessary to release the Remaining Escrow Amount to the Company. That is what the plain language of the Escrow Release Provisions requires.

**2.    The Exercise Of Contractual Discretion And The Implied Covenant Of Good Faith And Fair Dealing**

To avoid the result mandated by the plain language of the Escrow Release Provisions, Aizen contends that Section 10.10(a) of the Purchase Agreement grants him "sole and absolute discretion" to determine whether it is "necessary and proper" to disburse the escrowed funds. Dkt. 58 at 28. He maintains that he can exercise his discretionary authority to override the Escrow Release Provisions. That argument is not tenable.

Section 10.10(a) of the Purchase Agreement establishes the scope of Aizen's authority as Sellers' Representative. The operative language states:

> Each Seller Party hereby irrevocably appoints the Sellers' Representative as the designated representative of such Seller Party, as applicable, with full power and authority, including power of substitution, acting in the name of and for and on behalf of such Seller Party to do all things and to take all actions under or related to this Agreement that, in the sole and absolute

18

discretion of the Sellers' Representative, the Sellers' Representative considers necessary or proper, including . . .

(v) to receive payments under or pursuant to this Agreement and disburse the same to the Seller Parties, as contemplated by this Agreement, and

(vi) on behalf of each such Seller Party to enter into any agreement, instrument or other document to effectuate any of the foregoing, which shall have the effect of binding each such Seller Party as if such Person has personally entered into such agreement, instrument or document.

APA § 10.10(a) (formatting added). Aizen focuses on the sentence that grants him the authority "to do all things and to take all actions under or related to this Agreement that, in the sole and absolute discretion of the Sellers' Representative, the Sellers' Representative considers necessary or proper," and he combines it with the specific reference to receiving and disbursing payments under or pursuant to the Purchase Agreement. He asserts that he has made a judgment, in his sole discretion, that "it would not be necessary or proper to release the escrow funds to the Plaintiffs/Counterclaim-Defendants." Dkt. 58 at 28.

Aizen's interpretation of Section 10.10 is not a reasonable one. Section 10.10 vests Aizen with the discretion to carry out his post-closing duties and obligations as Sellers' Representative. That discretion extends to his duties and obligations under the Escrow Release Provisions, but it does not give Aizen the authority to ignore a mandatory provision of the Purchase Agreement governing the release of the escrowed funds. It would create an internal contradiction to read the Purchase Agreement as mandating that Aizen release the escrowed funds, while at the same time granting Aizen the authority to ignore that mandate. Aizen cannot cherry-pick the contractual provisions that he finds advantageous, while simultaneously ignoring the contractual obligations that he finds inconvenient.

19

Aizen's interpretation also ignores constraints that the implied covenant of good faith and fair dealing imposes on a party's exercise of discretion. The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.

*Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (cleaned up). To prevail on an implied covenant claim, a plaintiff must prove "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

When determining whether to invoke the implied covenant, a court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled." *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (ORDER). "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill." *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014). The court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec v. Shrader*, 991

20

A.2d 1120, 1127 (Del. 2010). "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue." *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (ORDER).

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled." *Allen*, 113 A.3d at 183. One reason a gap might exist is if the parties negotiated over a term and rejected it. Under that scenario, the implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party "failed to secure . . . at the bargaining table." *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004).

But contractual gaps may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency." *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008). "In only a moderately complex or extend[ed] contractual relationship, the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible." *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

Equally important, "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations." *Katz v.*

21

*Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* § 570, at 601 (Kaufman Supp. 1984)). "The implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement." *Dieckman*, 155 A.3d at 361.

Applying these principles, the Delaware Supreme Court has made clear that the implied covenant of good faith and fair dealing restrains a party's exercise of discretion under an agreement. The general rule is that the implied covenant requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain. That rule operates with special force "when a contract confers discretion on a party." *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 920 (Del. 2021). At a minimum, the implied covenant requires that the party empowered with the discretion to make a determination "use good faith in making that determination." *Gilbert v. El Paso Co.*, 490 A.2d 1050, 1055 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990).

Moreover, the Delaware Supreme Court has made clear that the use of the term "*sole discretion*," does not eliminate the implied duty and grant a party carte blanche to exercise discretion however it might wish. Addressing this issue specifically, the Delaware Supreme Court has explained that "the mere vesting of 'sole discretion' did not relieve the [holder] of its obligation to use that discretion consistently with the implied covenant of good faith and fair dealing." *Miller v. HCP Trumpet Invs., LLC*, 194 A.3d 908, 2018 WL 4600818, at *1 (Del. Sept. 20, 2018) (ORDER); *see CC Fin. LLC v. Wireless Props., LLC*, 2012 WL 4862337, at *5 n.53 (Del. Ch. Oct. 1, 2012) ("A contract which grants one party sole

22

discretion with respect to a material aspect of the agreement may, through the implied covenant of good faith and fair dealing, require that the exercise of discretion be in good faith.").

The question then arises as to what it means to exercise discretion "in good faith" for purposes of the implied covenant. The implied contractual term "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Restatement (Second) of Contracts § 205 cmt. a (Am. L. Inst. 1981), Westlaw (database updated Oct. 2022). A reviewing court does not simply introduce its own notions of what is "fair or reasonable under the circumstances." *Allen*, 113 A.3d at 184. When used with the implied covenant, the term "good faith" contemplates "faithfulness to the scope, purpose, and terms of the parties' contract." *Gerber v. Enter. Prods. Hldgs., LLC*, 67 A.3d 400, 419 (Del. 2013) (cleaned up), *overruled on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808 (Del. 2013). The concept of "fair dealing" similarly refers to "a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose." *Id.* (cleaned up). The application of these concepts turns "on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally." *Id.* (cleaned up).

"The implied covenant seeks to enforce the parties' contractual bargain by implying only those terms that the parties would have agreed to during their original negotiations if they had thought to address them." *Id.* at 418 (cleaned up). When applied to an exercise of discretion, this means that the exercise of discretionary authority must fall within the range

of what the parties would have agreed upon during their original negotiations, if they had thought to address the issue.

In the context of this case, the Purchase Agreement obligated Aizen to facilitate the release to the Company of any portion of the Original Escrow Amount that remained after any purchase price adjustment or the satisfaction of any indemnification obligations. Section 10.10(a) grants Aizen the authority to make decisions and take actions to fulfill the purpose of the Purchase Agreement, which includes the Escrow Release Provisions. The Escrow Release Provisions contemplate that Aizen would work with the Buyer to release the funds to the Company. At bottom, Aizen must use his contractual discretion in a manner that is faithful to (in the sense of consistent with) "the scope, purpose, and terms of the parties' contract." *Id.* at 419 (cleaned up).

A further contractual indication of the purpose underlying Aizen's authority is the language of Section 10.10(a), which authorized Aizen to act "in the name of and for and on behalf of" the Seller Parties. *See* APA § 10.10(a); *see also Behalf*, Black's Law Dictionary, Westlaw (defining "on behalf of" to mean "in the name of, on the part of, as the agent or representative of."). Aizen was empowered to use "sole and absolute discretion" to act in the name of and on behalf of the Seller Parties. He was not empowered to use his discretion to act on behalf of himself as a contingent creditor, nor on behalf of creditors generally. By exercising discretion for that purpose, Aizen has exceeded his authority under the Purchase Agreement.

Thus, the court will enter a final order declaring that the Company is entitled under the Purchase Agreement to the Remaining Escrow Amount.

## B. The Cessation Of Aizen's Authority

The plaintiffs next seek a declaratory judgment as to whether Aizen continues to retain power or authority over the Remaining Escrow Amount in his capacity as Sellers' Representative. The plaintiffs' position is simple. Given the analysis in the preceding section, Aizen no longer has any authority to make determinations regarding the Remaining Escrow Amount; his sole obligation is to facilitate the release of the Remaining Escrow Amount. Aizen makes four attempts to establish his authority to retain the Remaining Escrow Amount. None is persuasive.

### 1. Duties Under The Stay And Escrow Order

First, Aizen denies that he has any current duty to release the Remaining Escrow Amount to the Company under the Escrow Release Provisions. He claims that he "performed his obligations under Section 6.4 in negotiating and then providing joint instructions with [Buyer] to the Escrow Agent to release the remaining Indemnity Escrow Amount to the Delaware Escrow." Dkt. 58 at 36. He argues that the Stay and Escrow Order supplanted the Escrow Release Provisions such that only the language of the Stay and Escrow Order now controls. *Id.*

This argument runs contrary to the plain language of the Stay and Escrow Order. That order contemplated that the parties would jointly instruct Buyer to release the Remaining Escrow Amount to the Delaware Escrow Account. *See* Dkt. 38. The order further provides that the Remaining Escrow Amount could only be released upon "(1) an order of this Court, or (2) joint instructions by the Parties' respective Delaware counsel." *Id.* ¶ 2. The order expressly stated that "[b]y entering into the [Stay and Escrow Order],

25

neither Plaintiffs nor Defendant waive any, and expressly preserve all rights, claims and defenses." *Id.* ¶ 5.

The Stay and Escrow Order was an administrative mechanism to get the Buyer out of the picture and place the Remaining Escrow Amount in an account controlled by Delaware counsel, rather than an account controlled by Aizen. The Stay and Escrow Order did not displace the parties' commitments in the Purchase Agreement about when escrowed amounts would be released. Those terms continue to apply.

### 2. Duties Under The Sellers' Representative Provision

Next, Aizen asserts that he has "continuing duties as Sellers' Representative" that include "the duty to ensure performance of the APA, [the Termination Agreement], and related covenants." Dkt. 58 at 27 (formatting omitted). Aizen contends that his duties

> include the duty to protect the common interest of all Selling Parties, including himself, in the fair and equitable adjudication of competing claims to the escrow fund, and therefore in maintaining that fund intact while the parties' respective claims to the fund are adjudicated in the first-filed California Action.

*Id.* at 30. Aizen argues that his "continuing duties" to make decisions as Sellers' Representative do not cease simply because the other Seller Parties disagree with his decision. For that proposition, he relies on Section 10.10(d)(i) of the Purchase Agreement, which states: "Each Seller Party hereby agrees that: in all matters in which action by the Sellers' Representative is required or permitted, the Sellers' Representative is authorized to act on behalf of such Seller Party, notwithstanding any dispute or disagreement among the Seller Parties . . . ." APA § 10.10(d)(i) (formatting omitted).

26

Aizen is correct that the existence of disputes "among the Seller Parties" does not vitiate his authority. It is possible to envision circumstances when Aizen might validly argue that he has a duty to retain the Remaining Escrow Amount. For example, if there was a bona fide dispute among the Seller Parties as to the allocation of the Remaining Escrow Amount, then Aizen might retain the funds in a manner analogous to interpleader.

The current case is different. Aizen has not identified a valid reason to retain the Remaining Escrow Amount based on concern for the Seller Parties *qua* Seller Parties. Aizen seeks to retain the Remaining Escrow Amount to protect the rights of a contingent creditor who is pursuing unrelated litigation against the Company. Coincidentally, that plaintiff happens to be Aizen, but otherwise there is no connection between Aizen's claims and the Remaining Escrow Amount. As to the escrowed funds, Aizen is no differently situated than a third party with an unrelated claim against the Company.

What Aizen is trying to do is use the funds as a litigation escrow for his personal claims regarding his termination. The plain language of the Purchase Agreement makes clear that the Original Escrow Amount was held back from the purchase price for two specific purposes: to fund a purchase price adjustment and to secure the Seller Parties' indemnification obligations. *See id.* § 2.5(a)(i). The Purchase Agreement did not contemplate the use of those funds for any other purpose, such as a litigation escrow.

The plain language of the Escrow Agreement supports this reading. Its recitals state that the funds were placed in escrow "to provide assurance to Buyer in respect of certain obligations of the Seller Parties set forth in the Purchase Agreement." EA at 1 (Recitals). The Escrow Agreement does not contemplate other uses for the funds. The Escrow

Agreement even states that "[n]o Escrow Funds held in one Escrow Account shall be used for the purposes of the other Escrow Account or for any other purposes other than as set forth in this Agreement." *Id.* § 6(e). Under this provision, the funds comprising the Adjustment Escrow Amount cannot be used for indemnification claims, and the funds comprising the Indemnity Escrow Amount cannot be used for a purchase price adjustment. The proscription on cross utilization makes it all the more clear that the parties had no intention of using the escrowed funds for a different, unrelated purpose, such as a litigation escrow.

### 3.    A Broader Appeal To Equity

In a related argument in favor of preserving his control over the Remaining Escrow Amount, Aizen makes a broader appeal to equity. He asserts that "[t]he reasons for creating the Delaware Escrow remain and provide ample reason to continue the safeguarding of the funds until the California Action is resolved." Dkt. 58 at 42. Through this argument, Aizen openly seeks an injunction that would constitute a form of pre-judgment attachment. Aizen is not entitled to that form of relief from this court.

"Equitable relief that has the sole function and effect of freezing [a litigant's] assets in place to make them available to satisfy any possible future money judgment . . . is not within the proper exercise of the Court's power." *Uragami v. Century Int'l Credit Corp.*, 1997 WL 33175027, at *2 (Del. Ch. Dec. 2, 1997), *aff'd*, 710 A.2d 218 (Del. 1998). Stated differently, this court "lacks the power to grant an injunction for the sole purpose of aiding the collection or enforcement of a possible future money judgment in an unrelated action." *Neuberger v. Olson*, 1992 WL 50873, at *6 (Del. Ch. Mar. 11, 1992); *see E.I. Du Pont de*

28

*Nemours & Co. v. HEM Rsch., Inc.*, 576 A.2d 635, 640 (Del. Ch. 1989) (denying motion for preliminary injunction to enjoin payment of dividends when moving party's "only possible interest" in the money was as a source of possible future money judgment).

The principle is a venerable one, with Chancellor Wolcott having answered the same question a century ago:

> May the writ of injunction be employed in equity to accomplish the same purpose which is served by the writ of foreign attachment at law? Here the main defendant is a nonresident; he is charged with a breach of trust; property in the names of others, but alleged on information and belief to be his, is found in this state; this property is in no wise involved in the suit; and it is sought by a preliminary injunction to arrest it in the hands of its present holders to await the final decree, and then in some way to compel it to respond to the complainant in case the decree is in its favor. In its last analysis, is not this (eliminating for the moment the material circumstance that title to the shares is in persons other than the principal defendant) an employing of the injunction writ in equity as a foreign attachment is employed at law? The writ cannot be so employed. No authority can be found which allows it.

*Cities Serv. Co. v. McDowell*, 116 A. 4, 9 (Del. Ch. 1922). The writ of injunction "must be predicated on the existence of some equity. The anticipatory desire to aid the enforcement of a possible future decree, standing alone, has never been recognized as constituting such an equity." *Id.*

There is a narrow exception under which a court of equity can grant injunctive relief to protect its jurisdiction over property that a defendant otherwise would remove from the jurisdiction and place outside the court's control. *See, e.g.*, *Brinati v. TeleSTAR, Inc.*, 1985 WL 44688, *5 (Del. Ch. Sept. 3, 1985) (granting preliminary injunction protecting court's jurisdiction over assets by restraining defendants from expending those funds, other than for purposes of winding up or liquidating); *Eberhardt v. Christiana Window Glass Co.*, 74

29

A. 33, 36–37 (Del. Ch. 1909) (issuing preliminary injunction to preserve fund in controversy "to await the final determination of the cause"). If the property is unique, then the court may issue injunctive relief to preserve its jurisdiction to address claims relating to the property. If the property is money, then there must be a concrete threat that the defendant intends to render itself insolvent and judgment-proof. *See Mitsubishi Power Sys. Ams., Inc. v. Babcock & Brown Infrastructure Grp. US, LLC*, 2009 WL 1199588, at *5 (Del. Ch. Apr. 24, 2009) (granting temporary restraining order to party that made a colorable claim that any future transfer of the defendant company would be fraudulent *per se* under the Delaware Uniform Fraudulent Transfer Act); *see also In re CNX Gas Corp. S'holder Litig.*, 4 A.3d 397, 420 (Del. Ch. 2010) (denying injunction where "[n]o question has been raised, much less evidence presented, to cast doubt on CONSOL's solvency or ability to satisfy a damages award").

Aizen claims that the Company is "a non-functioning, defunct, and likely insolvent business that was and remains continually beset by self-dealing by its remaining family member officers and directors (*i.e.*, the plaintiffs), which threatens its future ability to pay any creditors, including Aizen." *See* Dkt. 58 at 19. The Company has not attempted to refute these claims. *See Am. Healthcare Admin. Sys.*, C.A. 0793 (Del. Ch. Sept. 27, 2022) (TRANSCRIPT); Dkt. 56; Dkt. 60. With the record viewed in the light most favorable to Aizen, it is reasonable to infer that the Company will be judgment-proof if it receives and then distributes the Remaining Escrow Amount.

The shortcoming in Aizen's analysis is that he has only identified a potential source of irreparable harm. He has not addressed the other two elements necessary to earn a

30

preliminary injunction, such as a probability of success on the merits or a balancing of the equities that favors injunctive relief. *See Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 179 (Del. 1986) (identifying elements). For this court to assess whether Aizen has a probability of success on the merits would require the court to evaluate the claims in the California Action. The parties have not briefed those issues, and it would be both inefficient and suggest a lack of comity for this court to delve into the merits of a case pending before a sister court.

Aizen therefore has not provided a basis for the court to issue relief that would function as a pre-judgment attachment. Instead, the court will nod to equity in its grant of relief. As discussed below, as a condition of granting the plaintiffs' request for an order of specific performance compelling Aizen to instruct the escrow agent to release the Remaining Escrow Amount, the court will delay the obligation to comply with that order for sixty days so that Aizen can seek relief against a potential wrongful distribution from the California Court.

### 4. Consideration For A Non-Compete Provision

Aizen's final argument is easily addressed. Aizen claims that the Remaining Escrow Amount cannot be released because the funds serve as consideration for a four-year non-compete between Aizen and the Buyer. *See* Dkt. 58 at 9. Aizen correctly observes that Section 6.8 of the Purchase Agreement imposed a four-year non-compete in favor of the Buyer. *See* APA § 6.8(b). But nothing links that obligation to any of the escrowed amounts. The escrowed funds were placed in escrow for specific purposes. They do not represent compensation for a non-compete.

31

## C. Aizen's Unclean Hands Defense

Aizen also invokes the equitable defense of unclean hands. *See* Dkt. 58. That doctrine applies the maxim of equity that "[h]e who comes into equity must come with clean hands." 1 John Norton Pomeroy, *Equity Jurisprudence* § 397 at 737 (4th ed. 1918). The maxim "dates back to the late eighteenth century when it was gleaned by a British barrister from a collection of cases in which plaintiffs had been denied relief on the basis of their inequitable conduct." *Nakahara v. NS 1991 Am. Tr.*, 718 A.2d 518, 522 (Del. Ch. 1998) (Chandler, C.); *see also Elec. Rsch. Prods., Inc. v. Vitaphone Corp.*, 171 A. 738, 749 (Del. 1934) (discussing the history of the "well established principle").

"The question raised by a plea of unclean hands is whether the plaintiff's conduct is so offensive to the integrity of the court that his claims should be denied, regardless of their merit." *Gallagher v. Holcomb & Salter*, 1991 WL 158969, at \*4 (Del. Ch. Aug. 16, 1991) (Allen, C.), *aff'd sub nom. New Castle Ins., Ltd. v. Gallagher*, 692 A.2d 414 (Del. 1997) (ORDER).

Unclean hands does not operate as a free-floating, bad-person defense based on conduct wholly unconnected to the facts of the case. "To bar relief, plaintiff's hands must be rendered unclean by reason of some conduct relating directly to the matter in controversy." *Walter v. Walter*, 136 A.2d 202, 207 (Del. 1957); *see also Nakahara*, 718 A.2d at 523 ("[I]n order for the doctrine to apply in the first place the improper conduct must relate directly to the underlying litigation.").

> [T]he doctrine of unclean hands does not affect all "sinners" and does not comprehend all "moral infirmities," the reason being that courts of equity are not primarily engaged in the moral reformation of the individual citizen; the

32

misconduct must be serious enough to justify a court's denying relief on an otherwise valid claim, for even equity does not require saintliness.

27A Am. Jur. 2d Equity § 21 (footnotes omitted), Westlaw (database updated Nov. 2022). "[U]nclean hands is a doctrine designed to protect the integrity of a court of equity, not a weapon to be wielded by parties seeking to excuse their own inequitable behavior by pointing out a trifling instance of impropriety by their counterpart . . . ." *Portnoy v. Cryo-Cell Int'l, Inc.*, 940 A.2d 43, 81 (Del. Ch. 2008).

"In fashioning a remedy for unclean hands, the Court has a wide range of discretion in refusing to aid the 'unclean litigant.'" *Merck & Co., Inc. v. SmithKline Beecham Pharm. Co.*, 1999 WL 669354, at *44 (Del. Ch. Aug. 5, 1999), *aff'd*, 746 A.2d 277 (Del. 2000) (ORDER) (affirming judgment), and *aff'd*, 766 A.2d 442 (Del. 2000) (affirming decision). "The application of the doctrine of unclean hands is not 'bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion.'" *Id.* (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245–46 (1933)). "Ultimately, the doctrine is about public policy, and the Court has the broad discretion to refuse relief if [a party] can establish that [the other party] does not meet a very basic though inexact standard: 'where the litigant's own acts offend the very sense of equity to which he appeals.'" *Id.* at *45 (quoting *Nakahara*, 718 A.2d at 522).

### 1. The Availability Of Unclean Hands As A Defense

A threshold question exists as to whether Aizen can invoke the defense of unclean hands in response to an action for breach of contract. "In a smattering of recent decisions, this court has endorsed to varying degrees the proposition that equitable defenses are not

33

available to defend against legal claims." *XRI Inv. Hldgs. LLC v. Holifield*, 2022 WL 4350311, at \*35 (Del. Ch. Sept. 19, 2022). The *XRI* decision devoted many pages to explaining why the broad assertion that equitable defenses cannot be raised to defeat legal claims constitutes an erroneous generalization. *Id.* at \*35–47. Many equitable defenses can be used to defeat legal claims. *Id.* at \*36.

Whether a party can raise a particular equitable defense in response to a legal claim depends on the equitable defense. One key consideration is the nature of the relief sought. If, for example, a party seeks an equitable remedy—such as specific performance or a permanent injunction—then a court may consider equitable defenses in deciding whether to award equitable relief. Another key consideration, regardless of the relief sought, is whether the equitable defense originated as a form of "equitable affirmative relief" that courts of equity issued to bar the enforcement of judgments at law, such that the defense now can be properly viewed as an affirmative defense to a legal claim. *See id.* at \*37–41, \*44–46. Yet another consideration, regardless of the relief sought, is whether the defense has otherwise succeeded in crossing the law-equity divide such that common law courts now embrace it. *See id.* at \*41–44. The assimilation of equitable principles by the law courts and the procedural merger of law and equity have produced a legal system in which most equitable defenses are available in actions at law. Describing the current reality, a leading treatise states:

> Most equitable defenses are now available in legal actions as well, even in jurisdictions, such as Delaware, that maintain separate courts of law and equity. Equitable defenses that today may be asserted in both legal actions and in equity include: fraud, mistake, waiver, acquiescence, ratification, failure    of    consideration,    discharge    of    surety,    impossibility,

34

unconscionability, duress, estoppel, rescission, lack of ripeness, and mootness.

Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.01, at 15-3 (2d ed. 2018 & Supp.) (footnote omitted). Other authorities say the same thing.[2]

---

[2] *See* Dan B. Dobbs, *Handbook on the Law of Remedies: Damages—Equity—Restitution*, § 2.3, at 44 (1973) [hereinafter Dobbs, *Law of Remedies*] ("Estoppel, waiver, acquiescence, and perhaps laches, have all worked over into law and are now regularly used in purely legal cases, along with equitable defenses generally."); *see also USH Ventures v. Glob. Telesystems Grp., Inc.*, 796 A.2d 7, 14 (Del. Super. 2000) ("[E]quitable defenses generally, a long time ago, worked their way into purely legal cases."); T. Leigh Anenson*, Treating Equity Like Law: A Post-Merger Justification of Unclean Hands*, 45 Am. Bus. L.J. 455, 463–64 (2008) [hereinafter *Equity Like Law*] ("Defenses like fraud, duress, illegality, unconscionability, and accommodation derived from equity but were converted to law and often considered legal defenses. Others retained their equitable designation but were routinely recognized in actions at law. Such equitable defenses included estoppel, waiver, rescission, ratification, and acquiescence." (cleaned up)); Bernard E. Gegan, *Turning Back the Clock on the Trial of Equitable Defenses in New York*, 68 St. John's L. Rev. 823, 847 (1994) ("Many matters such as duress, fraud and illegality, which had once been cognizable only in equity, were familiar defenses to a legal action by the end of the eighteenth century.") (quoting Fleming James, Jr. et al., *Civil Procedure* § 8.2, at 415 (4th ed. 1992)); Douglas Laycock, *The Triumph of Equity*, 56 L. & Contemp. Probs. 53, 70 (1993) ("[T]he equitable defenses are now generally available both at law and in equity.").

There are two outliers: laches and unclean hands. It is generally accepted that laches remains on the equity side of the divide and is only available to defend against an equitable claim.[3] A similar consensus does not exist as to the availability of unclean hands.[4]

---

[3] *See Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 (2014) ("[L]aches is a defense developed by courts of equity; its principal application was, and remains, to claims of an equitable cast for which the Legislature has provided no fixed time limitation."); *see also SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 137 S. Ct. 954, 959–64 (2017) (discussing *Petrella*); *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 974 (Del. Ch. 2016) ("There is, in my view, logical force for strictly applying statutes of limitations in this situation because a plaintiff pressing a purely legal claim in the Court of Chancery should not be able to avoid the statute of limitations by invoking the doctrine of laches when the limitations period would have conclusively barred the same claim had it been brought in a court of law.") (internal citation omitted); Dobbs, *Law of Remedies*, *supra*, § 2.4(4), at 76 ("Courts have routinely referred to laches as an equitable defense, that is, a defense to equitable remedies but not a defense available to bar a claim of legal relief."). At times, "delay in pursuing a right might well qualify as an estoppel or even a waiver or abandonment of a right, as courts sometimes recognize." Dobbs, *Law of Remedies*, *supra*, § 2.4(4), at 76. In cases where the delay amounts to an estoppel or waiver, then the delay would provide a defense to a legal claim. *See id.*

[4] *Compare* T. Leigh Anenson, *Announcing the "Clean Hands" Doctrine*, 51 U.C. Davis L. Rev. 1827, 1851 (2018) ("Historically, the defense applied to all equitable relief, but only equitable relief."), Wolfe & Pittenger, *supra*, § 15.01 ("Other defenses, among them laches, unclean hands, and the balancing of equities, remain more equitable in nature and generally cannot be asserted as defenses in purely legal actions."), *and* Dobbs, *Law of Remedies*, *supra*, § 2.4(2), at 71 ("If the [unclean hands defense] is really an appeal to equitable discretion [and not an appeal to generate a rule of law], then it should apply only to bar equitable remedies. It should be dropped entirely if it is asserted as a defense against a legal remedy."), *with Cummings v. Wayne Cnty.*, 533 N.W. 2d 13, 13 (Mich. Ct. App. 1995) ("The authority to dismiss a lawsuit for litigant misconduct is a creature of the 'clean hands doctrine' and, despite its origins, is applicable to both equitable and legal damages claims."), T. Leigh Anenson, *Limiting Legal Remedies: An Analysis of Unclean Hands*, 99 Ky. L. J. 63, 73 & n.62 (2010) (collecting authorities to support the proposition that "[c]ourts from seven states have declared the doctrine of unclean hands available in an action at law."), *and* Zechariah Chafee, Jr., *Coming into Equity with Clean Hands*, 47 Mich. L. Rev. 877, 878 (1949) ("I propose to show that the clean hands doctrine . . . ought not to be called a maxim of equity because it is by no means confined to equity . . . .").

As originally framed, the unclean hands defense was purely an equitable defense and not a form of equitable affirmative relief. It prevented a petitioner from seeking relief in the Court of Chancery in the first instance; it was not a doctrine that a court of equity could use to issue an injunction barring an action at law. And compared to the other defenses originating in equity, the unclean hands doctrine was "considerably newer." *Equity Like Law*, *supra*, at 466 & n.63. The earliest known invocation of something akin to unclean hands in the United States was in 1725, when one highwayman filed a bill in the equity arm of the Court of Exchequer seeking an accounting against his partner in crime. *Everet v. Williams* (Ex. 1725) (known as the "*The Highwayman's Case*," as reported long afterward in a note by that name in 9 L. Q. Rev. 197, 197–99 (1893)). Finding the contents of the bill "scandalous and impertinent," the court denied the bill on that ground, and both highwaymen were hanged. *Id.*; *see Shondel v. McDermott*, 775 F.2d 859, 868 (7th Cir. 1985) (Posner, J.) (discussing *The Highwayman's Case*).

In 1728, Richard Francis formulated an early conception of the unclean hands doctrine, coining the maxim of equity "he that hath committed inequity shall not have equity." Chafee, *supra*, at 880. Francis later caveated his maxim with the requirement that "the Iniquity must have been done to the defendant himself." Richard Francis, *Maxims of Equity* 5 cmt. a (3d ed. 1791). A reframing of this maxim, known as "clean hands," first entered the vernacular in 1787, when the Court of Exchequer crystalized the principle that "a man must come into a Court of Equity with clean hands; but when this is said, it does not mean a general depravity; it must have an immediate and necessary relation to the equity sued for." Chafee, *supra*, at 882 (quoting *Dering v. Earl of Winchelsea*, 29 Eng.

37

Rep. 1184, 1185 (1787)). The unclean hands doctrine did not garner much fame or attention until 1881, when Pomeroy published the first edition of his treatise.[5]

Meanwhile, since at least 1775, common law courts applied a similar principle that has become known as the *in pari delicto* doctrine. For example, in *Holman v. Johnson*, Lord Mansfield, while serving as a judge on the King's Bench, explained that

> [t]he objection, that a contract is immoral or illegal as between plaintiff and defendant, sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed; but it is founded in general principles of policy, which the defendant has the advantage of, contrary to the real justice, as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this; *ex dolo malo non oritur actio*. No Court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If, from the plaintiff's own stating or otherwise, the cause of action appears to arise *ex turpi causa*, or the transgression of a positive law of this country, there the court says he has no right to be assisted.

[1775] 1 Cowp. 341, 98 Eng. Rep. 1120 (KB).

Scholars have characterized *Holman* as the "seminal case" for the *in pari delicto* doctrine. *See, e.g.*, Brian A. Blum, *Equity's Leaded Feet in a Contest of Scoundrels: The Assertion of the* In Pari Delicto *Defense Against a Lawbreaking Plaintiff and Innocent Successors*, 44 Hofstra L. Rev. 781, 786 n.31 (2016) ("*Holman v. Johnson* is regarded as

---

[5] Chafee, *supra*, at 884 (chronicling the scholarly treatment of unclean hands; noting that it did not appear in the early editions of Joseph Story's *Commentaries on Equity Jurisprudence*). Story's *Commentaries* did not mention the doctrine of unclean hands until the eleventh edition, after Story himself stopped working on the treatise. The treatise mentioned unclean hands in a footnote, describing it as a "rule analogous" to the maxim that "he who seeks equity, must do equity." 1 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* § 64e, at 59 n.2 (12th ed. 1877).

the seminal case in which Lord Mansfield expressed both the *ex turpi causa* principle and the *in pari delicto* rule."). As the Supreme Court of the United States has explained, the doctrine, which "literally means 'in equal fault,' is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Pinter v. Dahl*, 486 U.S. 622, 632 (1988). Yet at the same time, the *Pinter* decision characterized the *in pari delicto* doctrine as an "equitable defense," illustrating the blending of legal and equitable principles. *Id.* (internal citation omitted). The *Pinter* court openly acknowledged the existence of doctrinal drift, observing that "[c]ontemporary courts have expanded the [*in pari delicto*] defense's application to situations more closely analogous to those encompassed by the 'unclean hands' doctrine, where the plaintiff has participated 'in some of the same sort of wrongdoing' as the defendant." *Id.*

Other authorities illustrate the blending of unclean hands and *in pari delicto* into a more general defense based on inequitable conduct. For example, despite *Holman*'s status as the seminal common law decision for *in pari delicto*, courts have quoted *Holman* when describing the doctrine of unclean hands.[6] And despite reference to *The Highwayman's*

---

[6] *See, e.g.*, *Am. Bell Inc. v. Fed'n of Tel. Workers of Pa.*, 736 F.2d 879, 886 (3d Cir. 1984) (describing *Holman* as establishing an "equitable principle" about "unclean hands" despite the fact that *Holman* was a decision of a common law court that addressed *in pari delicto*); *Marshall v. Lovell*, 19 F.2d 751, 755–56 (8th Cir. 1927) (finding that "[a]ppellant is not in equity with clean hands" while relying on *Holman*); *Highland Tank & Mfg. Co. v. PS Int'l, Inc.*, 393 F. Supp. 2d 348, 361–62 (W.D. Pa. 2005) (relying on *Holman* and describing unclean hands as "an English common law doctrine" (cleaned up)); *Nester v. Cont'l Brewing Co.*, 23 A. 102, 105 (Pa. 1894) (relying on *Holman* when addressing equitable claims); *Sowles v. Welden Nat'l Bank*, 17 A. 791, 792 (Vt. 1889) (relying on *Holman* in legal action for assumpsit and describing the operative principle as "a rule that

*Case* as the foundational unclean hands decision, that case now serves as a cornerstone for the *in pari delicto* doctrine.[7] Some courts seem to use the terms interchangeably.[8] As a result, at least one legal camp has concluded that "[t]oday, 'unclean hands' really just

---

those who come into a court of justice to seek redress must come with clean hands, and must disclose a transaction warranted by law" (citation omitted)).

[7] *Williams Elecs. Games, Inc. v. Garrity*, 366 F.3d 569, 574 (7th Cir. 2004) (Posner, J.) ("The defense of *in pari delicto* is intended for situations in which the victim is a participant in the misconduct giving rise to his claim as in the classic case of the highwayman who sued his partner for an accounting of the profits of the robbery they had committed together." (cleaned up)); *United States v. Bedi*, 453 F. Supp. 3d 563, 572 (N.D.N.Y. 2020) ("[T]he equitable principle to be derived from *The Highwayman's Case* is that of *in pari delicto*, or perhaps unclean-hands, depending on the precise context in which the defense is raised."), *rev'd and remanded on other grounds by* 15 F.4th 222 (2d Cir. 2021); *Leland v. Ford*, 223 N.W. 218, 223 (Mich. 1929) ("In the early day the equity side of the Exchequer, in the case of *Everet v. Williams* [or "*The Highwayman's Case*"], dealt most severely with those *in pari delicto* who sought its aid." (formatting added)).

[8] Dobbs, *Law of Remedies*, *supra*, § 2.4(2), at 68 & n.6 ("The unclean hands defense used in this way may be just another phrase for the illegality rule under the pari delicto doctrine, and courts frequently seem to use the phrases interchangeably."); *id.* § 13.6, at 879 ("Unclean hands and *pari delicto* doctrines are often mentioned in the same judicial opinions. Sometimes courts seem to use the terms as if they were distinct doctrines, sometimes as if they were about the same." (footnotes omitted)); *see Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (discussing *in pari delicto* using authorities addressing unclean hands); *Lawler v. Gilliam*, 569 F.2d 1283, 1294 (4th Cir. 1978) ("Much of our discussion about in pari delicto applies to the defense of unclean hands; sometimes, the two concepts are considered to be interchangeable."), *abrogated by Pinter v. Dahl*, 486 U.S. 622 (1988); *Lord v. Chadbourne*, 42 Me. 429, 433–34 (Me. 1856) ("The plaintiff should come into Court with clean hands. In regard to contracts, no principle of law is better settled, than that the law will not lend its aid to enforce an illegal contract, or one founded on an illegal consideration. *In pari delicto, potior est conditio defendentis*."); *Ryan v. Motor Credit Co.*, 23 A.2d 607 (N.J. Ch. Ct. 1941) ("[I]n granting relief to the borrower, the courts, both of law and equity, have subordinated the equitable doctrines of in pari delicto, unclean hands and 'he who seeks equity must do equity to the legislative fiat . . . .").

means that in equity as in law the plaintiff's fault, like the defendant's, may be relevant to the question of what if any remedy the plaintiff is entitled to."[9]

---

[9] *Shondel*, 775 F.2d at 868; *see also, e.g.*, *Schlueter v. Latek*, 683 F.3d 350, 355 (7th Cir. 2012) ("When as in such cases the plaintiff is asking for equitable relief, the *in pari delicto* defense is referred to as the unclean-hands defense. But the label doesn't matter, and the defenses were equated in *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360–61 (1995) . . . ."); *Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir. 1969) ("Although [the plaintiff] is not seeking equitable relief, the doctrine [of unclean hands] remains applicable, since it expresses a general principle equally suited to damage actions."); *Kohler v. Staples the Office Superstore, LLC*, 291 F.R.D. 464, 470 (S.D. Cal. 2013) ("In fact, the Court [in *Mckennon*] recognized that unclean hands may still be applicable to non-equitable forms of relief . . . ."); *Smith v. Cessna Aircraft Co.*, 124 F.R.D. 103, 106 (D. Md. 1989) ("Although the maxim originated in courts of equity, it now extends to actions at law, such as the instant suit for damages."); *Union Pac. R. Co. v. Chi. & N.W. Ry. Co.*, 226 F. Supp. 400, 410 (N.D. Ill. 1964) ("The clean hands maxim is not peculiar to equity, but expresses a general principle equally applicable to damage actions."). *See generally* Blum, *supra*, at 800–01 ("[S]ome courts continue to confine the unclean hands doctrine to equitable relief. Other courts are not so wedded to the crumbling division between law and equity and no longer confine the unclean hands doctrine to suits in equity." (footnotes omitted)).

Dobbs remarks that "[i]f [the doctrines] are not the same, there are probably two important differences." Dobbs, *Law of Remedies*, *supra*, § 13.6, at 879–80. The first is that even if a court of equity denies equitable relief on the basis of unclean hands, the plaintiff should be able to assert legal claims in a court of law. *Id.* at 880. The same is not true of the *in pari delicto* defense: "The *pari delicto* doctrine . . . would bar the plaintiff's entire claim, not merely one of the possible remedies for it." *Id.* The second is that the "unclean hands doctrine relies heavily on equity's claim of moral superiority, not on a policy of discouraging wrongdoing." *Id.* With unclean hands, the doctrine exists to "maintain the court's own robes free from blemish." *Id.* The *in pari delicto* defense, by contrast, bars relief because the plaintiff is "morally worse than the defendant," which creates an incentive for parties to avoid wrongdoing (or at least be less blameworthy than the opponent). *Id.*; *accord Bateman Eichler*, 472 U.S. at 306–07 (describing the premises of the *in pari delicto* doctrine as "first, that courts should not lend their good offices to mediating disputes among wrongdoers; and second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality").

Nonetheless, "[t]he most orthodox view of the unclean hands doctrine makes it an equitable defense; that is, one that can be raised to defeat an equitable remedy, but not one that defeats other remedies." Dobbs, *Law of Remedies*, *supra*, § 2.4(2), at 68.[10] A line of Court of Chancery decisions has arrived at this outcome. Those decisions treat the defense of unclean hands as generally unavailable to defeat a legal claim, but available if the plaintiff seeks equitable relief.[11] Although that approach implicitly views unclean hands as

---

[10] Under this "orthodox view," a court may exercise its discretion "to deny a purely equitable remedy, while leaving the plaintiff full access to her legal remedies." Dobbs, *Law of Remedies*, *supra*, § 2.4(2), at 69; *see Problems of Res Judicata Created by Expanding "Cause of Action" Under Code Pleading*, Note, 104 U. Penn. L. Rev. 955, 957 (1956) (observing that if a court of equity "denied the equitable relief on a principle of a 'court of conscience,' such as laches, unclean hands, etc.," then it "was held that the plaintiff was not barred from proceeding at law for his legal remedy"). Dobbs also maintains that a party should have to show actual harm (or a threat of actual harm) before invoking the doctrine of unclean hands:

> If there are any cases at all in which there is room for "unclean hands" as a purely equitable defense based on discretion to deny equitable remedies, the plaintiff's remedy against the defendant should not be denied unless his misconduct has actually harmed the defendant, or has at least put the defendant in substantial risk of harm from that misconduct.

Dobbs, *Law of Remedies*, *supra*, § 2.4(2), at 70. Dobbs acknowledges that "[c]ourts do not seem to limit themselves invariably to such usage." *Id.* at 68.

[11] *See In re Liquid. of Indem. Ins. Corp., RRG*, 2019 WL 2152844, at *5 (Del. Ch. May 15, 2019) (holding that unclean hands was not available as a defense to an action seeking a declaratory judgment that a bank had a valid and enforceable security interest in the loan "because . . . claims do not invoke equity and are not, therefore, subject to equitable defenses" (cleaned up)); *NASDI Hldgs., LLC v. N. Am. Leasing, Inc.*, 2019 WL 1515153, at *1 (Del. Ch. Apr. 8, 2019) ("Because the equitable doctrine of unclean hands may not supply a defense to a purely legal claim, the unclean-hands defense also fails."), *aff'd*, 276 A.3d 463 (Del. 2022); *Quantlab Grp. GP, LLC v. Eames*, 2019 WL 1285037, at *7 (Del. Ch. Mar. 19, 2019) (holding that unclean hands was not a defense where case turned on interpretation of partnership agreement as a matter of law), *aff'd*, 222 A.3d 580 (Del. 2019);

unavailable in an action at law that does not seek legal relief, there are Delaware Superior

Court decisions that have applied the defense.[12]

_____

*Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at \*25 (Del. Ch. Dec. 19, 2017) (holding that unclean hands failed as defense because plaintiff sought "money damages— a quintessentially legal form of relief"), *aff'd*, 195 A.3d 16 (Del. 2018); *Lehman Bros. Hldgs. v. Spanish Broad. Sys., Inc.*, 2014 WL 718430, at \*7 n.47 (Del. Ch. Feb. 25, 2014) ("[T]he 'unclean hands' doctrine bars equitable relief, but not legal, relief."), *aff'd*, 105 A.3d 989 (Del. 2014); *In re Est. of Tinley*, 2007 WL 2304831, at \*1 (Del. Ch. July 19, 2007) (declining to consider doctrine of unclean hands when awarding statutory right to an elective share; noting that parties had only cited cases applying unclean hands in cases seeking equitable relief or mixed equitable and legal relief).

Some of these decisions contain broad language suggesting that equitable defenses generally are unavailable whenever a party pursues a legal claim in equity. The *XRI* decision responded to those assertions by showing that many equitable defenses originated as forms of equitable affirmative relief that supported injunctions against the prosecution of an action at law or the enforcement of a judgment, so they operated as defenses to action at law. The *XRI* decision also showed that other equitable defenses had crossed the law-equity divide and been embraced by common law courts. The *XRI* decision concluded that general assertions about the nonavailability of equitable defenses can be misleading and that it is therefore necessary to examine the equitable defense in question. *See XRI*, 2022 WL 4350311, at \*35–47.

[12] *See Mfrs. & Traders Tr. Co., Wilm. Savs. Fund Soc., FSB v. Wash. House P'rs, LLC*, 2012 WL 1416003, at \*4 (Del. Super. Mar. 22, 2012) ("While the unclean hands doctrine is generally an equitable defense available in the Court of Chancery, this Court is permitted to consider equitable defenses raised by parties."); *Kroll, Inc. v. Salesorbit Corp.*, 2008 WL 2582989, at \*2 (Del. Super. June 25, 2008) (denying summary judgment on defendant's claim that plaintiff acted with unclean hands when seeking to collect on promissory note); *cf. Korotki v. Hiller & Arban, LLC*, 2017 WL 2303522, at \*11 & n.78 (Del. Super. May 23, 2017) (characterizing the unclean hands defense as "purely equitable" and "'generally inappropriate' where legal remedies are sought," but recognizing conflicting authority; stating that the *in pari delicto* defense is "[a]kin to the doctrine of unclean hands").

There is also a decision in which then-Judge Quillen, who previously served as an Associate Justice on the Delaware Supreme Court and as Chancellor of this court, explained why the Delaware Superior Court should be able to consider the full range of equitable defenses that would be available in a system that had merged its courts of law

"[A]t bottom, the unclean hands doctrine is a 'rule of public policy.'"[13] And there

are competing policies at play. The case for applying the unclean hands doctrine broadly

---

and equity, while acknowledging that "certain equitable defenses which are purely equitable in nature," such as unclean hands, "may present adoptability problems." *USH Ventures*, 796 A.2d at 20. In a footnote, he acknowledged that "[t]he defense of 'unclean hands' is generally inappropriate for legal remedies." *Id.* at 20 n.16. In a case where the defendants only relied on *USH Ventures* for the proposition that parties facing a claim for breach of contract that sought only legal relief should be able to raise equitable defenses, this court downplayed the discussion in *USH Ventures* as "free-wheeling dicta." *NASDI*, 2019 WL 1515153, at *6 n.47. And it is true that Justice Quillen modestly described his discussion using those self-deprecating terms. *USH Ventures*, 796 A.2d at 14. But the parties in *USH Ventures* had asked Judge Quillen to seek appointment as a Vice Chancellor *pro hac vice* so that he could consider equitable defenses, and he had rejected that request. His "preliminary digression" was pertinent to that issue and provided his explanation for reaching the outcome he did. *Id.* at *13–20. It was thus not technically dictum. Nor was it "free-wheeling." I would characterize it as a scholarly and well-supported exposition of the evolution of equitable defenses and their role in contemporary actions at law.

[13] *Morente v. Morente*, 2000 WL 264329, at *3 (Del. Ch. Feb. 29, 2000); *accord Skoglund v. Ormand Indus., Inc.*, 372 A.2d 204, 213 (Del. Ch. 1976) (describing doctrine as "a rule of public policy" rather than "a matter of defense to be applied on behalf of litigants"); *Vitaphone Corp.*, 171 A. at 749 ( "It (the doctrine of unclean hands) is a rule that lays restrictions upon complainants, and tells them that an appeal for relief to a court of conscience will not be honored by one who has himself been guilty of unconscionable conduct." (formatting in original)).

To call the unclean hands doctrine a "rule" of public policy is something of a misnomer. It is more aptly regarded as a standard animated by public policy. Other decisions appropriately refer to the unclean hands doctrine as a standard. *See eBay Domestic Hldgs., Inc. v. Newmark*, 2009 WL 3806162 (Del. Ch. Nov. 9, 2009) (observing that certain actions, taken together may satisfy "an 'unclean hands' standard"); *see also, e.g.*, *Finjan, Inc. v. Juniper Network, Inc.*, 2018 WL 4181905, at *7 (N.D. Cal. Aug. 31, 2018) ("Such a tactic, as alleged, goes beyond mere 'hands that are not as clean as snow,' which would not by itself meet the unclean hands standard." (cleaned up)); *Wecare Hldgs., LLC v. Bedminster Int'l Ltd.*, 2009 WL 2226681, at *2 (W.D.N.Y. July 23, 2009) (considering whether certain conduct rose "to the level of inequity, bad faith and unconscionability to support the unclean hands standard articulated by this Court"). *See generally Equity Like Law*, *supra*, at 503 (describing the "standard-like quality" of the unclean hands doctrine and rejecting characterization of doctrine as "bundles of rules

relating to diverse subject"; stating that "the only way to achieve a more unified rule of unclean hands is through the experiential process of precedent"); Duncan Kennedy, *Form and Substance in Private Law Adjudication*, 89 Harv. L. Rev. 1685, 1688 (1976) ("At the opposite pole from a formally realizable rule is a standard or principle or policy. A standard refers directly to one of the substantive objectives of the legal order. . . . The application of a standard requires the judge both to discover the facts of a particular situation and to assess them in terms of the purposes or social values embodied in the standard."); Kathleen M. Sullivan, *The Supreme Court, 1991 Term—Foreword: The Justices of Rules and Standards*, 106 Harv. L. Rev. 22, 58 (1992) ("Rules aim to confine the decisionmaker to facts . . . . A legal directive is 'standard'-like when it tends to collapse decisionmaking back into the direct application of the background principle or policy to a fact situation."). There is a long-standing debate over the benefits of rules versus standards. *See* Louis Kaplow, *Rules Versus Standards: An Economic Analysis*, 42 Duke L.J. 557, 559 (1992) (contrasting the consequences of a standards-based decisionmaking regime with those of a rules-based regime); Pierre Schlag, *Rules and Standards*, 33 U.C.L.A. L. Rev. 379, 383 (1985) ("The possibility of casting or construing directives as either rules or standards has given rise to patterned sets of 'canned' pro and con arguments about the value of adopting either rules or standards in particular contexts."); Cass R. Sunstein, *Problems with Rules*, 83 Calif. L. Rev. 953, 984–85 (1995) ("If we are fanatical about limiting interpretive discretion, we will be disturbed to find that laws apparently intended as *ex ante* rules call for judgments by interpreters at the point of application . . . Some laws that appear to be rules are really standards: their terms squarely invite moral and political judgments."). Equity has generally favored standards, and one of the traditional roles of equity has been to deploy fact-specific equitable doctrines to mitigate the sometimes harsh outcomes that a bright-line rule of law can produce. *See Tusi v. Mruz*, 2002 WL 31499312, at *4 (Del. Ch. Oct. 31, 2002) ("Equitable defenses are frequently fact specific and, thus, their application depends upon the unique circumstances of each case."); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 728 A.2d 25, 52 n.105 (Del. Ch. 1998) ("[E]quitable and fiduciary principles . . . by their nature are highly fact specific and particularized . . . ."), *aff'd sub nom. Quickturn Design Sys., Inc. v. Shapiro*, 721 A.2d 1281 (Del. 1998); *accord Holland v. Florida*, 560 U.S. 631, 650 (2010) ("We have said that courts of equity must be governed by rules and precedents no less than the courts of law. But we have also made clear that often the exercise of a court's equity powers must be made on a case-by-case basis. In emphasizing the need for flexibility, for avoiding mechanical rules, we have followed a tradition in which courts of equity have sought to relieve hardships which, from time to time, arise from a hard and fast adherence to more absolute legal rules, which, if strictly applied, threaten the evils of archaic rigidity." (cleaned up)). *See generally* Jill E. Martin, *Hanbury & Martin on Modern Equity* 3 (14th ed.1993) (noting that equity assists in "[d]eveloped systems of law" by introducing "discretionary power to do justice in particular cases where the strict rules of law cause hardship.").

starts from the premise that courts should not be granting relief to parties who have acted improperly and at the same time recognizes that public confidence in the judicial system would decline if bad actors prevailed notwithstanding their bad acts.[14] Making the doctrine of unclean hands broadly available also ensures that courts can consider case-specific factors that call for a departure from an otherwise applicable rule of law: "Empowering the judge through the invocation of unclean hands is an essential institutional check." *Beyond Chafee*, *supra*, at 541. And in situations like *The Highwayman's Case*, the doctrine enables courts to avoid becoming embroiled in disputes over illegal transactions. *See* Henry L. McClintock, *Handbook of the Principles of Equity* § 26, at 59–69 (2d ed. 1948) ("No court, and certainly no court which considers itself a court of conscience, can spend its time and the public money in determining how the proceeds of an inequitable transaction should be divided between the parties to it.").

But there are countervailing interests. Litigants regularly cast stones, and it is all too easy for a litigant to invoke the doctrine of unclean hands. Its ready availability increases litigation costs, injects an additional issue for resolution into the case, and creates the risk

---

[14] *See, e.g*, T. Leigh Anenson, *Beyond Chafee: A Process-Based Theory of Unclean Hands*, 47 Am. Bus. L.J. 509, 528 (2010) [hereinafter *Beyond Chafee*] (describing the doctrine's "procedural justice component"); *see also Gaudiosi v. Mellon*, 269 F.2d 873, 882 (3d Cir. 1959) ("Courts in such situations act for their own protection and not as a matter of 'defense' to the defendant."); *Hall v. Wright*, 240 F.2d 787, 795 (9th Cir. 1957) ("In applying the clean hands maxim, the court is 'concerned primarily with protecting its own integrity from improper action by a party."); *Nakahara*, 718 A.2d at 521–22 ("The doctrine of unclean hands functions to promote and protect courts of equity . . . The unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case.").

that close calls on difficult facts will subvert the doctrine. Even if a litigant is ultimately unsuccessful in proving the defense, she may enjoy the residual benefits of painting her opponent as an unsavory character. *Cf.* Chafee, *supra*, at 878 ("[T]he use of the clean hands maxim does harm by distracting judges to the basic policies which are applicable to the situation before them.").

Having explored the historical evolution of the unclean hands doctrine, evaluated its moderate but not universal success in crossing the equity-law divide, and weighed the competing policy interests, this decision adheres to the Court of Chancery precedents that have arrived at the endpoint that Dobbs recommends. Under that approach, a defense of unclean hands is generally unavailable to defeat a legal claim, but becomes available if the plaintiff seeks equitable relief.

In this case, the plaintiffs are seeking equitable relief in the form of a decree of specific performance compelling Aizen to release the Remaining Escrow Amount. The plaintiffs are not solely seeking legal relief in the form of money damages or a declaratory judgment. By invoking the court's equitable powers, the plaintiffs have opened the door to Aizen's assertion of an unclean hands defense.

### 2. The Grounds For Unclean Hands

Having concluded that Aizen can invoke unclean hands as a defense, the next question is whether he has made a sufficient showing to warrant denying the plaintiffs' motion. Aizen failed to present evidence sufficient to create a genuine issue of material fact about whether the plaintiffs' conduct was sufficiently reprehensible as to forfeit their right to relief.

47

### a. The Termination Agreement

Aizen first claims that the plaintiffs have unclean hands because the Company induced him to enter into the Termination Agreement with the promise of $20.8 million, plus other benefits. He claims that the Purchase Agreement was contingent on him entering into the Termination Agreement such that any misconduct in connection with the latter undermines the validity of the former. Presumably, he views the Seller Parties' rights under the Purchase Agreement as an enrichment that they unjustly received.

"[F]or the unclean hands doctrine to apply, the inequitable conduct must have an 'immediate and necessary' relation to the claims under which relief is sought." *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 237–38 (Del. Ch. 2014) (cleaned up). "The doctrine of unclean hands provides that a litigant who engages in reprehensible conduct *in relation to the matter in controversy* forfeits his right to have the court hear his claim, regardless of its merit." *Portnoy,* 940 A.2d at 81 (cleaned up).

> Thus, in applying the unclean hands doctrine, the relevant inquiry is not whether the nonmovant's hands are dirty, but whether the nonmovant dirtied them in acquiring the right that party now asserts, or whether the manner of dirtying renders inequitable the assertion of such rights against the movant. . . . The maxim does not extend to any misconduct, however gross, that is unconnected with the matter in litigation, and with which the opposite party has no concern.

27A Am. Jur. 2d Equity § 25, Westlaw (database updated Aug. 2022).

Aizen's complaints about the Termination Agreement are too far removed from the current dispute over the Purchase Agreement. Aizen is litigating those issues in the California Action, not in this court. Thus, an unclean hands defense based on breach of the Termination Agreement is not sufficiently related to the matter in controversy.

48

### b. The Possibility Of A Fraudulent Transfer Or Illegal Dividend

Aizen next argues that the plaintiffs have unclean hands because the Company could distribute the Remaining Escrow Amount to its stockholders as a fraudulent transfer or illegal dividend. That fear is not sufficient to invoke the doctrine.

To invoke the doctrine of unclean hands, a party must identify something that the opponent has already done or is currently doing. A party cannot invoke a speculative fear about future wrongdoing. Aizen is concerned about something that might happen in the future, which is not a basis for unclean hands.

To support his effort to invoke the doctrine of unclean hands now, Aizen observes that Delaware courts do not require a showing of injury to plead the unclean hands defense. It is true that this court has rejected the notion of "no harm, no foul" and held that "[e]quity does not reward those who act inequitably, even if it can be said that no tangible injury resulted." *Nakahara v. NS 1991 Am. Tr.*, 739 A.2d 770, 792 (Del. Ch. 1998); *cf.* T. Leigh Anderson, *Announcing the "Clean Hands" Doctrine*, 51 U.C. Davis. L. Rev. 1827, 1870 ("The prevailing view is that unclean hands applies even though the plaintiff has not injured anyone (including the defendant)."). But someone must have acted (or be acting) inequitably.

Aizen has taken the notion of pre-crime and applied it to unclean hands. *See* Philip K. Dick, *The Minority Report*, *in* The Philip K. Dick Reader 323, 324 (1956) (depicting a dystopian world in which the government imprisons people because it believes they will commit crimes in the future). For unclean hands, the proposition does not work. The threat of future wrongdoing does not figure into the unclean hands analysis.

49

**D.  The Order For Specific Performance Compelling The Release Of Funds**

Having prevailed in seeking declaratory judgment and having defeated Aizen's counterarguments regarding his authority, pre-judgment attachment, and unclean hands, the plaintiffs seek an order that compels Aizen to provide joint instructions to the escrow agent to effectuate the release. The plaintiffs have earned that remedy, but the court will impose a moderate condition on its implementation.

A decree of specific performance is "the appropriate form of relief to compel the release of funds from an escrow account."[15] To obtain specific performance, a party must "prove by clear and convincing evidence" that a legal remedy would be inadequate and that "(1) a valid contract exists, (2) he is ready, willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (footnotes omitted); *see QC Hldgs.*, 2018 WL 4091721, at *11 (applying these factors to release of escrowed funds).

The plaintiffs are plainly ready, willing, and able to perform under the Purchase Agreement and the Stay and Escrow Order by issuing the necessary instructions to the

---

[15] *QC Hldgs., Inc. v. Allconnect, Inc.*, 2018 WL 4091721, at *11 (Del. Ch. Aug. 28, 2018); *see, e.g.*, *Sparton Corp. v. O'Neil*, 2018 WL 3025470, at *4 (Del. Ch. June 18, 2018) (issuing injunction requiring party to release escrow funds); *E. Balt LLC v. E. Balt US, LLC*, 2015 WL 3473384, at *2–4 (Del. Ch. May 28, 2015) (holding that this court had jurisdiction over an action for "an order requiring Defendants to provide joint written instructions directing the Escrow Agent to release the remaining Escrow Amount" because money judgment alone would not be an adequate remedy); *Xlete, Inc. v. Willey*, 1977 WL 5188, at *1 (Del. Ch. June 6, 1977) ("[T]he Court of Chancery has the power to specifically enforce escrow agreements which are by their very nature fiduciary relationships.").

escrow agent. The Purchase Agreement is a valid contract under Delaware law. And there is no longer any dispute regarding the plaintiffs' entitlement to the Remaining Escrow Amount. The only remaining questions are whether the plaintiffs have an adequate remedy at law and whether the balance of equities tips in their favor. In this case, the Purchase Agreement answers these questions.

### 1. The Plaintiffs Lack An Adequate Remedy At Law.

The plaintiffs have shown that they lack an adequate remedy at law by pointing to provisions in the Purchase Agreement that provide expressly for a decree of specific performance and stipulate to the existence of irreparable harm in the event of a breach. The existence of these provisions is sufficient to support a decree of specific performance, although a court can decline to issue one if there are supervening equities or other considerations. There are none on these facts.

Section 10.8 of the Purchase Agreement provides that "if any party violates or refuses to perform any covenant or agreement made by it herein, the non-breaching party shall be entitled, in addition to any other remedies or relief permitted herein, to specific performance of such covenant or agreement," and "each party hereby agrees not to raise any objections to the availability of specific performance . . . to specifically enforce the terms and provisions of this Agreement, and to enforce compliance with the covenants and obligations in this Agreement." APA § 10.8(a) (the "Specific Performance Clause") (formatting omitted). "Delaware is strongly contractarian, and the presence of a provision in favor of specific performance in case of breach, as the parties contracted for here, must be respected." *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 2016 WL 3576682, at

51

*2 (Del. Ch. June 24, 2016), *aff'd*, 159 A.3d 264 (Del. 2017). That said, a court is not required to enforce a specific performance provision. *See* Dobbs, *Law of Remedies*, *supra*, § 12.9(6), at 819 ("[T]he court may consider the contract provision in favor of specific performance, not as binding, but as an important influence on the exercise of discretion."); *see also Godwin v. Collins*, 1868 WL 1255, at *1 (Del. Ch. Mar. 1868) ("It is the established rule that a specific performance of a contract of sale is not a matter of course, but rests entirely in the discretion of the court upon a view of all the circumstances." (cleaned up)). But when a party has agreed to provision like the Specific Performance Clause, the party must establish a persuasive case-specific why the clause should not be respected.

The plain and unambiguous language of the Specific Performance Clause is sufficient to support a decree of specific performance. Aizen has not pointed to facts or circumstances that would cause the court to decline to enforce this provision.

Although the language of the Specific Performance Clause is sufficient, the Purchase Agreement also addresses the inadequacy of a legal remedy by providing that a breach of its provisions constitutes irreparable harm. "A party can prove inadequate relief at law by showing irreparable damages will result without specific performance." 71 Am. Jur. 2d Specific Performance § 11, Westlaw (database updated Aug. 2022) (formatting omitted). Section 10.8(a) of the Purchase Agreement also provides that "each party acknowledges that the other party would be damaged irreparably and would have no adequate remedy of law if any provision of this Agreement is not performed in accordance

52

with its specific terms or otherwise is breached." APA § 10.8(a) (the "Irreparable Harm Clause").

The language of the Irreparable Harm Clause is sufficient to establish the inadequacy of a remedy at law.

> In Delaware, parties can agree contractually on the existence of requisite elements of a compulsory remedy, such as the existence of irreparable harm in the event of a party's breach, and, in keeping with the contractarian nature of Delaware corporate law this court has held that such a stipulation is typically sufficient to demonstrate irreparable harm.

*Martin Marietta Mat'ls, Inc. v. Vulcan Mat'ls Co*., 56 A.3d 1072, 1145 (Del. Ch. 2012) (Strine, C.) (footnotes omitted), *aff'd*, 68 A.3d 1208 (Del. 2012); *see also Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *11 (Del. Ch. June 5, 2006) (Strine, V.C.) (upholding the parties' contractual stipulation "that money damages would not be an adequate remedy for any breach" of the agreement, and that any party to the contract "may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance").

The plain and unambiguous language of the Irreparable Harm Clause is sufficient to support the lack of an adequate remedy at law. As with the Specific Performance Clause, Aizen has not pointed to facts or circumstances that would cause the court to decline to enforce the Irreparable Harm Clause.

Even without provisions like the Specific Performance Clause and the Irreparable Harm Clause, this court has held that a party's failure to comply with a requirement to

direct an escrow agent to release funds constitutes irreparable harm and warrants a decree of specific performance.[16] Those same principles apply here.

In response to unambiguous contractual language and settled law, Aizen argues that Section 10.10(b) of the Purchase Agreement grants him "unique protections" that "limit Plaintiffs' rights to establish irreparable harm from breach based on the pleadings alone." Dkt. 58 at 40. Section 10.10(b) is an indemnification provision which states:

> Each of the Seller Parties hereby agrees to indemnify and hold the Sellers' Representative and its agents, assigns and representatives harmless from and against any and all Damages that the Sellers' Representative may sustain or incur as a result of or arising out of any action or inaction of the Sellers' Representative in its capacity as such, or otherwise relating to its appointment as Sellers' Representative, except to the extent arising out of the gross negligence or willful misconduct of the Sellers' Representative.

APA § 10.10(b). Aizen argues that he has a right to indemnification from the Company and that if the Remaining Escrow Amount is released, then the Company will distribute the funds to its stockholders and will not be able to fulfill his indemnification right.

Aizen's argument is a non sequitur. It does not address the role of specific performance or the existence of irreparable harm. It instead provides another reason why

---

[16] *See Sparton*, 2018 WL 3025470, at *4 ("The escrow funds belong to Defendants, and under the circumstances, damages would not adequately compensate Defendants for their losses."); *United BioSource LLC v. Bracket Hldg. Corp.*, 2017 WL 2256618, at *4 (Del. Ch. May 23, 2017) ("[E]ven if plaintiff could obtain a judgment for damages in a law court, defendants have failed to show how plaintiff could then enforce its judgment as to the sum held in escrow.") (cleaned up)); *Xlete, Inc. v. Willey*, 1977 WL 5188, at *1 (Del. Ch. June 6, 1977) (finding that defendant failed to establish that plaintiff "ha[d] a remedy at law that was as certain, prompt, complete, or efficient as the equitable remedy" of an order "directing the release of a sum of money held in escrow").

Aizen believes that he is a contingent creditor who should have access to the Remaining Escrow Amount to satisfy his claims. That is another version of Aizen's pre-judgment attachment argument, which this decision has already rejected. And here, the pre-judgment attachment argument is even weaker, because the right of indemnification extends to the Seller Parties, not just the Company. So even if the Company distributes amounts to its stockholders, those stockholders as Seller Parties still will have an obligation to indemnify Aizen.

The plaintiffs have established the inadequacy of a remedy at law sufficient to warrant a decree of specific performance.

### 2. The Balance Of Equities Favors The Plaintiffs.

The final issue is the balancing of the equities. This factor "reflect[s] the traditional concern of a court of equity that its special processes not be used in a way that unjustifiably increases human suffering." *Bernard Pers. Consultants, Inc. v. Mazarella*, 1990 WL 124969, at *3 (Del. Ch. Aug. 28, 1990). This court's precedents support balancing the equities in favor of ordering the release of the last portion of the transaction consideration from escrow.[17] The Buyer bargained for an escrow fund to secure the Company's financial

---

[17] *See Sparton*, 2018 WL 3025470, at *4 ("The equities are in Defendants' favor because Sparton never had the right to withhold the escrow funds under the parties' agreements."); *FriendFinder Networks Inc. v. Penthouse Glob. Media, Inc.*, 2017 WL 2303982, at *17 (Del. Ch. May 26, 2017) (holding that balance of equities favored plaintiff where "allowing assets that are rightfully [plaintiff's] to remain in the custody and control of [defendant] will harm [plaintiff] more than taking those domains that were not [defendant's] at the time of closing away from [defendant]"); *SLC Beverages, Inc. v. Burnup & Sims, Inc.*, 1987 WL 16035, at *3 (Del. Ch. Aug. 20, 1987) (finding that equities

obligations to the Buyer. The Company has met those obligations. The Buyer is satisfied. The plaintiffs are now entitled to the Remaining Escrow Amount .

Aizen argues that the balance of equities tips in his favor because he "seeks only to maintain the status quo" under the Stay and Escrow Order. *See* Dkt. 58 at 42. Aizen's argument fails to acknowledge that the Stay and Escrow Order preserved the parties' arguments and positions under the Purchase Agreement. The status quo as it existed under the Stay and Escrow Order is that the Remaining Escrow Amount would stay in escrow until release was warranted under the terms of the Purchase Agreement. It is Aizen who seeks to change the status quo by keeping the Remaining Escrow Amount in escrow as a form of pre-judgment attachment.

Although an order of specific performance is warranted, that does not mean that the release must happen instantaneously. A court may place conditions on a decree of specific performance. *See* Wolfe & Pittenger, *supra*, § 16.03[c], 16-55; *see also Mumford v. Long*, 1986 WL 2249, at *4 (Del. Ch. Feb. 21, 1986) (granting specific performance on condition that plaintiffs pay contract price and interest to nonmoving party); *Valley Builders, Inc. v. Stein*, 193 A.2d 793, 799 (Del. Ch. 1963) (granting specific performance on condition that parties obtain necessary county regulatory agency approvals). This court has exercised that

---

favored issuance of a mandatory injunction where "plaintiff is suffering injury by being prevented from obtaining the consideration which it bargained for").

authority to delay the release of funds from escrow, particularly when doing so would further judicial economy.[18]

As discussed above, there is a non-trivial risk that the Company will distribute the Remaining Escrow Amount to its stockholders and render itself judgment-proof. If that threat is sufficiently real, then pre-judgment attachment might be warranted. The proper court to consider that issue is not this court but the California Court. That is the court presiding over the underlying claim, and that is the court that should determine whether the equities are strong enough to support some form of interim relief to preserve a source of recovery.

The equitable outcome is to provide Aizen with a brief window in which to seek relief from the California Court. How brief? I have no interest in creating a false emergency for a California colleague. Sixty days should suffice for Aizen to make an application and for the parties to brief the issue. The final order in this action therefore will delay the effective date for the release of the Remaining Escrow Amount for sixty days.

---

[18] *See J&J Produce Hldgs., Inc. v. Benson Hill Fresh, LLC*, 2020 WL 1188052, at *5 (Del. Ch. Mar. 11, 2020) (ORDER) (granting in part motion for partial summary judgment; holding seller was entitled to escrowed funds; ordering funds to remain in escrow until conclusion of case to avoid "a series of unproductive procedural moves and countermoves"); *see also Schillinger Genetics, Inc. v. Benson Hill Seeds, Inc.*, 2021 WL 320723, at *18 (Del. Ch. Feb. 1, 2021) ("As a matter of judicial economy, a series of potential and disruptive appeals can be avoided by denying the request for the decree and allowing the Adjustment Escrow Funds to remain in escrow until the end of the case." (cleaned up)).

The plaintiffs argue that Aizen should not be given this opportunity because he could have applied to the California Court years ago. But that would have been a gratuitous application, because the Remaining Escrow Amount remained in escrow. I do not think a trial judge in California, presiding over a busy docket, would have appreciated an application seeking to freeze already frozen funds. I know I would not. At this point, the facts have changed, and Aizen should have an opportunity to seek relief.

## III. CONCLUSION

The plaintiffs' motion for partial judgment on the pleadings is granted with the condition that the Remaining Escrow Amount will not be released until sixty days after the entry of the order implementing this opinion. If there are other issues that need to be addressed before this proceeding can conclude at the trial level, the parties shall submit a joint letter identifying them and proposing a schedule for their resolution. If there are no other disputes, then the parties will submit a final order that has been agreed as to form.